Clement SUMNER, Appellant,

v.

UNITED STATES POSTAL SERVICE, Appellee.

No. 762, Docket 89–6191.

United States Court of Appeals, Second Circuit.

Argued Jan. 29, 1990.

Decided March 28, 1990.

Morris H. Wheeler, New York City (Philip Ransom Schatz, Ogden N. Lewis, Vincent T. Chang, Davis Polk & Wardwell, New York City, on brief), for plaintiff-appellant.

Paula T. Dow, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. for S.D.N.Y., Richard W. Mark, Asst. U.S. Atty., on brief), for defendant-appellee.

Before OAKES, Chief Judge, and KEARSE and FLETCHER,* Circuit Judges.

FLETCHER, Circuit Judge:

Appellant Clement Sumner, who is black, worked for the United States Postal Service from January 1981 until he was fired in June 1984. In his complaint and at trial, Sumner charged that the Postal Service's decision to terminate him discriminated on the basis of race and constituted illegal retaliation for his engaging in activities protected under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e. The Postal Service denied any racial discrimination or retaliatory animus. The district judge, after a five day bench trial, dismissed Sumner's complaint, and Sumner appeals from that final order. We reverse.

## FACTS AND PROCEDURAL HISTORY

Sumner was hired by the Postal Service in January 1981 as a "part-time flexible subcarrier"; he was assigned to the General Post Office at the James A. Farley Building, Eighth Avenue and 33rd Street, New York City. His job responsibilities included bundling, delivering, and collecting mail on a part-time basis. Frank Montemarano was Sumner's immediate supervisor for a year beginning in the summer of 1981. Montemarano also served as a supervisor of Delivery and Collections. In that capacity he issued work assignments to the part-time flexible subcarriers. The relevant chronology of Sumner's employment history, including his disciplinary record and his discrimination complaints against the Postal Service, is as follows.

On March 29, 1982, the Postal Service issued a letter of warning to Sumner for committing an unsafe act (improper loading

---

*Hon. Betty B. Fletcher, United States Circuit Judge for the Ninth Circuit, sitting by designation.

and closing of a storage box). Following Sumner's appeal through the union grievance process, the letter of warning was reduced to an "oral discussion" and was expunged from Sumner's disciplinary record. The Postal Service's disciplinary system progresses in severity from oral discussions and letters of warning through several day suspensions to termination. When an employee is disciplined, the typical procedure is for the employee to receive a letter which informs him or her of the alleged infraction, the penalty to be imposed, and any prior incidents that were taken into account in deciding upon the discipline imposed. Under Postal Service procedures, oral discussions are not filed in an employee's formal disciplinary file and may not be relied upon as a prior infraction to increase the severity of discipline for a subsequent infraction. The employee may appeal imposition of discipline through a multi-stage grievance procedure.

In April of 1982, Sumner filed a complaint with the Equal Employment Opportunity Commission alleging sex discrimination by Tour Superintendent Hewlett. Sumner was pursuing a Master's Degree in Theater and wished to attend classes. According to Sumner, the Postal Service had modified the work schedules of two women in order to allow them to attend college classes, but had refused to do the same for Sumner. The Postal Service agreed to modify Sumner's schedule, and he withdrew his EEO complaint.

On May 14, 1982, the Postal Service notified Sumner that he was suspended for seven days because on April 24 he had taken an unauthorized lunch period, was insubordinate to a supervisor, and had failed to make a collection. The Postal Service later modified the suspension to a letter of warning. This was expunged from Sumner's record, but relied upon in the Notice of Proposed Removal that culminated in his termination.

On June 23, 1982, Sumner filed an EEO complaint against Mr. Hewlett, Acting Tour Superintendent Travis, and Supervisor Santiago alleging that the May 14 suspension was issued in reprisal for his filing the April EEO complaint. The parties subsequently settled; the Postal Service reduced the suspension to a letter of warning, and Sumner withdrew his complaint.

According to Sumner, in the spring or summer of 1982 he complained to Montemarano, who was his supervisor at the time, that preferred routes were being assigned to carriers on a racially discriminatory basis. Sumner testified that he wrote a letter, which was signed by him and three other carriers, and presented to Montemarano. Montemarano testified that he remembered the four carriers complaining about work assignments but could not recall whether Sumner had alleged racial discrimination.

From early summer 1982 through October 1983, Sumner worked for supervisors other than Montemarano and was not disciplined. In October 1983, Sumner's supervisor went on leave, and Montemarano assumed her duties. On October 12, Montemarano issued a letter of warning to Sumner for an alleged failure to work mandatory overtime on October 3. Sumner claimed he had obtained advance permission from another supervisor to miss the scheduled day because he had to appear in court. The union supported Sumner and charged that Montemarano's action was not justified. In December 1983, the Postal Service agreed to reduce the letter of warning to an oral discussion six months after the issue date, provided there was no subsequent discipline. Sumner discontinued his grievance. In the meantime, on October 14, 1983, Montemarano had issued a letter of warning to Sumner for being absent without official leave ("AWOL") for two and one-half hours on October 7. In October 1983, Sumner transferred to another section in the Post Office.

On February 27, 1984, Sumner sent a letter to George Shuman, the New York Postmaster, complaining that Supervisor Ruben Blumen was mismanaging the department and unfairly treating the carriers.

On March 2, 1984, Sumner's immediate supervisor, Stella Pearson, at the direction of General Supervisor Blumen, suspended Sumner for seven days for being "AWOL."

According to Pearson's testimony before the EEOC, Sumner called in to say he would be late, but Blumen nonetheless instructed Pearson to charge Sumner with being AWOL for his tardiness. Blumen and Pearson discussed the appropriate penalty, and, based on the prior disciplinary record, imposed the suspension. The Postal Service modified the suspension to three days on July 16, 1984, after Sumner was terminated. On March 20, Sumner initiated an informal EEO complaint charging the Postal Service with racism. On March 29, Pearson, either with Blumen's approval or at his direction, suspended Sumner for fourteen days for being absent for eight hours on February 27.

In April 1984, Sumner converted the March 20 informal complaint into a formal EEO complaint charging Blumen with racial discrimination. Sumner noted that economic oppression is the trademark of racism and alleged that the two suspensions were an attempt to deprive him of his job. Sumner also circulated a petition directed to the Postmaster General complaining of Blumen, including his inability "to live and work with other human beings." Seventy-nine co-workers signed the petition.

On May 2, 1984, the incident that resulted in Sumner's termination occurred.[1] Some details of the encounter remain disputed, but the broad contours are fairly clear. Because of a back injury, Sumner had been reassigned to another section, put on "limited duty," and given approval by his supervisor to rest his back at his discretion. Sumner was assigned to slot mail at a letter carrier case, which is a cabinet approximately six feet high with a ledge approximately 28 inches from the floor, above which are mail slots. Montemarano testified at trial that he observed Sumner

sitting on the ledge of the case, a position which the Postal Service views as unsafe. Sumner testified at trial that he was sitting on a stool in front of the case, not on the case. His testimony was corroborated by three other postal employees with whom Sumner was talking at the time of the incident. The district court specifically found that Sumner was telling the truth on this point. According to Montemarano, he approached Sumner because he saw Sumner committing this "very big safety infraction." He asked Sumner, "What are you supposed to be doing?" Witnesses testified that when he approached Sumner, Montemarano's manner was "accusative," "agitated," and "looking for trouble." Sumner testified that he and his coworkers laughed, because they had just been talking about the fact that Montemarano had not bothered him for some time. Montemarano testified that Sumner responded in a disrespectful manner. All agree that Sumner told Montemarano that he was not his (Sumner's) supervisor, that Sumner said he had to go to the bathroom, and that he left, refusing to speak any further with Montemarano. A short time later, after speaking with Sumner's supervisors, Montemarano again saw Sumner and tried to speak with him. According to Montemarano, Sumner placed his fingers in his ears, stuck out his tongue, mumbled unintelligibly, and refused to speak to Montemarano. Sumner denied doing this, but the district judge believed Montemarano on this point.[2]

Shortly afterward, Montemarano recommended that Sumner be fired. In his report to his immediate superior, Montemarano based the recommendation on the safety violation, disrespect to a supervisor, and failure to obey a direct order. On May 21, 1984, Montemarano issued Sumner a No-

---

**1.** Appellant finds it "noteworthy" that the notice of proposed removal was issued less than three weeks before the six-month period was to expire. Given that Sumner had already received two suspensions after the condition was imposed, the timing of the proposed removal appears to be of no consequence.

**2.** The court based its conclusion on Sumner's admission in a previous Merit System Protection Board hearing that he wanted to taunt

Montemarano, an admission which the court found Sumner "unconvincingly attempted to repudiate or nullify at trial." The district court misread the hearing record. Actually, Sumner had made the admission of wanting to taunt Montemarano in connection with his earlier refusal to speak and his retreat to the men's room. Sumner always denied the report of the second interaction, and there were no witnesses to it.

tice of Proposed Removal. The Notice informed Sumner that the Postal Service intended to "remove" him based on two charges: (1) committing an unsafe act, and (2) disrespect to a supervisor. The Notice also stated that the Postal Service considered Sumner's record in deciding what disciplinary action to impose, and listed six prior disciplinary actions.

Sumner appealed the removal through each step of the grievance process; his appeal was denied at each step. Sumner then appealed the decision to terminate him to the Merit Systems Protection Board (MSPB), which afforded him a hearing before an Administrative Law Judge. The ALJ concluded that no safety violation had occurred, but found that Sumner had been disrespectful, and that this justified termination. Sumner petitioned the EEOC for review. On September 10, 1986 the Commission upheld the MSPB decision, finding that the Postal Service had a legitimate, nondiscriminatory reason for firing Sumner, and that he had failed to demonstrate that this reason was pretextual.

On October 3, 1986, Sumner pro se filed this action alleging that the Postal Service violated Title VII. Pro bono counsel was appointed in March 1989. After conducting a five day bench trial, the district court found that no safety violation had occurred, but nevertheless dismissed Sumner's race discrimination claims as "conclusory and generalized" and concluded that the record failed to support Sumner's retaliation claim. Finding that the reasons offered by the Postal Service to justify its decision were not "pretextual" within the meaning of Title VII and that no impermissible motive played a part in Sumner's removal, the court dismissed Sumner's complaint. Final judgment was entered on June 19, 1989; Sumner filed a timely notice of appeal on August 14, 1989.

## STANDARD OF REVIEW

A district court's conclusion regarding discriminatory intent in Title VII suits is a finding of fact which we set aside only if clearly erroneous within the meaning of Fed.R.Civ.P. 52(a). *Anderson v.*

*City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Pullman Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Davis v. State University of New York,* 802 F.2d 638, 642 (2d Cir.1986). We will disturb such findings only when we are "left with the definite and firm conviction that a mistake has been committed." *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)).

## DISCUSSION

Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–3(a) prohibits employers from firing workers in retaliation for their opposing discriminatory employment practices. Section 704(a) provides in relevant part that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The order and allocation of burdens of proof in retaliation cases follow that of general disparate treatment analysis as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Davis v. SUNY,* 802 F.2d 638, 642 (2d Cir.1986), Schlei and Grossman, *Employment Discrimination Law,* 557 (1983). Plaintiffs bear the burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. To prevail in a § 704(a) retaliation case, the plaintiff must show that he engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between

the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980).

▆▆▆ To establish that his activity is protected under Title VII, a plaintiff need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed. *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989); *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988). In addition to protecting the filing of formal charges of discrimination, § 704(a)'s opposition clause protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges. *See Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989), and Schlei & Grossman, *Employment Discrimination Law*, 548–49 (1983).

▆▆▆ The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus. *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.), *cert. denied* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); *Grant v. Bethlehem Steel*, 622 F.2d 43, 46 (2d Cir. 1980). Title VII is violated if a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause, *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986), and if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the discharge. *DeCintio*, 821 F.2d at 116,

n. 8. Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If they do so, the burden then shifts back to the plaintiff "to demonstrate that the proffered reason was not the true reason" for the decision, i.e. that the articulated reason is a pretext. *Id.* at 256, 101 S.Ct. at 1095. The ultimate burden of persuasion, of course, remains with the plaintiff. *Id.* at 253, 101 S.Ct. at 1093. These allocations of burdens of production and proof in retaliatory discharge cases are not meant to be "rigid, mechanistic, or ritualistic. The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally discriminated or retaliated against the plaintiff for engaging in protected activity." *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1354 (9th Cir.1984); *U.S. Postal Service v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

▆▆▆ Although no one piece of evidence is dispositive, the confluence of circumstances leaves us with a "definite and firm conviction" that a mistake was committed when the district court concluded that the Postal Service's explanation for terminating Sumner was not pretextual and that no impermissible motive played a part in the decision.

The Postal Service in its Notice of Proposed Removal and at trial stated as the basis of its decision to terminate Sumner two immediate causes, a safety infraction and insubordination, considered in light of Sumner's disciplinary history. The unsafe act never occurred but even had it occurred its seriousness is in doubt. The Postal Service alleged in its brief and Montemarano testified at trial that sitting on a carrier case is generally viewed as a very serious infraction, but a Postal Service employee testified at trial that in his 35 years of postal employment he had never heard of anybody being disciplined for doing so. The several witnesses to the event testified that Montemarano approached Sumner not by warning him that it was unsafe to sit on

the ledge, but rather by asking him what he was supposed to be doing, implying loafing rather than endangerment. The safety charge is pretty clearly pretextual.

As for the charge of insubordination, even accepting the Postal Service's account of the May 2 incident, Sumner's response to Montemarano does not rise to the level of insubordination that would warrant firing, particularly when considered in light of the history of interactions between Sumner and his supervisors and what appears from the record to be the milieu of the office. Montemarano and Blumen, for whatever reason, had a history of "writing up" Sumner for minor infractions and imposing more severe sanctions than were warranted. Sumner testified that he believed that Montemarano was looking for a confrontation and that he, Sumner, was not going to give it to him. He took to the men's room instead.[3] In addition, the record suggests that Montemarano acted in a manner that could be counted on to elicit a rise from Sumner. Where the employer provokes a reaction from an employee, that reaction should not justify a decision to impose a disproportionately severe sanction. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 709 (3rd Cir.1989). More important, evidence Sumner introduced at trial established that Sumner's response was quite measured as compared with that of some co-workers, who, for instance, when asked for an explanation for arriving late to work replied, "Don't tell me about coming late, you'd better be glad I'm here," or said "f— you stupid idiot" to a supervisor. It is noteworthy that in the first example, the carrier had a prior disciplinary record similar to Sumner's and yet received only a seven day suspension, which later was reduced to a two day suspension. He, however, had not filed any recent EEO complaints.

Sumner presented considerable evidence of disparate disciplinary treatment of carriers, alleging that carriers who had committed more serious safety infractions and more outrageous episodes of disrespect had not been threatened with termination unless the violator also had filed EEO complaints. The district court failed to address this evidence at all despite its importance to a case such as this.

■■■ The Postal Service practice is to consider the employee's disciplinary history when deciding what particular penalty to impose. In the Notice of Proposed Removal, the Postal Service reported that it based its decision to fire Sumner in part on six prior disciplinary actions. However, at least one and possibly two of the six should not have been considered, either because they had been expunged from Sumner's employment record or because they were not final. The district court found Sumner's disciplinary history in conjunction with the insubordination incident sufficient to support the decision to terminate Sumner, but the disciplinary history can only serve to enhance a penalty, it cannot justify discipline that otherwise had no basis. Where the immediate events advanced as justification for current discipline are pretextual, the disciplinary history alone cannot support the decision to terminate the plaintiff.

In addition to indirect evidence that the stated reasons for termination were pretextual, the record contains some direct evidence that the Postal Service's decision was based on impermissible motives. At trial, Montemarano testified that Sumner had a "war-like attitude." When pressed as to what he was referring to he stated that he had in mind the time in 1982 when Sumner complained to him about the unfair distribution of assignments. The court did not view this as a "smoking gun," but seen in the context of Montemarano's hostility to-

---

**3.** Sumner admitted in the MSPB hearing that he wanted to "taunt" Montemarano, and the district court found Sumner's claim of not fully understanding the meaning of the word unpersuasive. However, nothing in the account of the interaction is inconsistent with his testimony at trial that he believed Montemarano was looking for a confrontation and that Sumner was not going to give it to him. The fact that Sumner may have wished to taunt Montemarano does not make his actual response insubordinate, and Sumner's retreat to the bathroom probably accomplished both his stated objectives.

ward Sumner and Sumner's history of protected activity, some of it explicitly charging racism as detailed in the district court's order,[4] Montemarano's remark lends credence to the claim of retaliatory animus. Further, Montemarano never denied the racial discrimination component of the specific complaint he alluded to:

Q: Do you remember him making any references during that complaint about assignment being made on the basis of race?

A. I don't think he ever said that in those words. He might have said them. I don't recall if he did say it at the time.

There is simply no evidence to rebut Sumner's claim that he was engaged in protected activity. We find the district court's finding in this regard clearly erroneous.

## CONCLUSION

We find that the district court erred in finding that the Postal Service's articulated reason for firing Sumner was not pretextual and that the decision was not based on impermissible motives under Title VII. We reverse. We remand to the district court for determination of the remedial award.

---

**4.** Not detailed was Sumner's testimony that Blumen's discriminatory practices motivated Sumner to write letters to the Postmaster; also one of Sumner's immediate supervisors somewhat reluctantly testified at the EEO hearing that she perceived Blumen to discriminate on the basis of race.

Q: Did Mr. Blumen single out persons of one skin color or another for the way he wanted them marked when they were tardy?

A: I really can't say.

Q: Feel free to testify. You're clothed with immunity and you're under oath and you can say what you believe and what you saw. You work for him.

A: Yes. There were some instances where I felt that Mr. Blumen particularly didn't care for male Black, Hispanic and Latin background people.

Q: So that there was a disparate treatment between those and the others, would you say? What did you observe?

A: In my opinion, that's what I felt.

(Appellant Brief, Exhibit B).

However, Sumner's letter merely charged Blumen with mismanaging the department and being unable to get along with human beings. As the district court found, this does not allege racial discrimination.