**Mary Elizabeth DUFFY, Plaintiff,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant.**

No. 92 CV 4825.

United States District Court, E.D. New York.

May 27, 1996.

Richard B. Lind, New York City, for plaintiff.

David M. Wirtz, Rains & Pogrebin P.C., Mineola, New York, for defendant.

### *MEMORANDUM & ORDER*

DEARIE, District Judge.

On October 13, 1992, plaintiff Mary Duffy filed this suit against her former employer, State Farm Mutual Automobile Insurance Company ("State Farm"), alleging that she was terminated because of her age and because she filed an age discrimination charge with the New York State Division of Human

Rights ("NYSDHR"). State Farm moves for summary judgment on both causes of action.

## FACTS

State Farm hired plaintiff in December 1988 as a receptionist at its Bulova office in Queens. She was terminated on February 7, 1992. Plaintiff was 59 years old at the time of her termination. Beyond this, the parties' versions of the facts differ substantially. According to plaintiff's version, Duffy was an innovative employee who received regular salary increases and became the target of harassment by one of her supervisors. By contrast, defendant maintains that plaintiff was an incompetent employee for whom it made repeated accommodations despite her poor performance and her bad attitude. Both parties submit affidavits and excerpts of plaintiff's deposition in support of their accounts of Duffy's tenure at State Farm.

Plaintiff started working as a receptionist in December 1988 and received a salary increase after six months based on a recommendation approved by her supervisor Debra Pouch. See Duffy affidavit, ¶ 20; exhibit A ("Mary is courteous and pleasant to all callers . . . [S]he attempts to distribute calls promptly."). Plaintiff requested to be reassigned from the switchboard because the heavy volume of incoming calls affected her high blood pressure. Duffy Deposition at 223. In July 1989, plaintiff was transferred to the mail room to work as a mail and file clerk, a job that entailed opening and sorting mail and pulling files from filing cabinets. When asked about this reassignment, plaintiff described her supervisors as "very accommodating." Id. at 169. When plaintiff complained that pulling the files caused her lower back pain, her supervisor told her that she no longer had to pull files with the other clerks and that she could spend her time identifying and indexing incoming mail. Id. at 40. Plaintiff described this decision as an "accommodation." Id. In December 1989, plaintiff received another salary increase based on a recommendation signed by Pouch. See Duffy affidavit ¶ 3; exhibit B ("Mary has made a great effort to adjust to her new position in Mail & File.").

Plaintiff had trouble keeping up with her indexing assignment. Minafo Affidavit, ¶ 3.

Therefore, on May 1, 1990, Minafo reassigned plaintiff to work on the "six day hunt list" and "dead storage requests." A backlog developed, and Minafo sent plaintiff a memorandum dated May 17, 1991, warning her that she "must clear all current backlog and remain current." Defendant's Affidavits, Exhibit C. On May 18, 1990, Minafo sent plaintiff another warning memorandum outlining the requirements of the six-day hunt list position. Defendant's Affidavits, Exhibit D. Plaintiff's response to Minafo's criticism was to confront her, claiming that she had never received any instructions. Minafo Affidavit, ¶ 4.

Plaintiff conceded that "[t]here was a backlog." Duffy Deposition at 236. According to plaintiff, she and Minafo had never gotten along and Minafo had singled her out for harassment. Id. at 249. Describing her conflicts with Minafo, plaintiff stated, "I don't think my age ever entered into it." Id. On November 29, 1990, plaintiff received another salary increase approved by Pouch. See Duffy affidavit, ¶ 4; exhibit C ("Mary has adjusted to her position handling 6 day Hunt List mail and Dead Storage requests. She seems to understand more about the unit than in the past. Her attendance record has improved since her memo of August 1990.").

In March 1991, State Farm opened an office in Whitestone, Queens and reorganized the personnel assignments at its Bulova office. As part of this restructuring, plaintiff was assigned to oversee priority mail. In the spring of 1991, Audrey Warren became mail room supervisor at the Bulova office, and Kathleen Murray was transferred to the Bulova office as the claims superintendent and Warren's supervisor. According to plaintiff, a "personality conflict" developed between Murray and herself. When Murray made disparaging comments about the mail room at a meeting, plaintiff was the only employee to stand up to Murray and defend the work of the mail room employees. Duffy affidavit at ¶ 7. Plaintiff claims that Murray was annoyed by her comments and therefore initiated a "vendetta" against her. Plaintiff maintains that, on the same day as this confrontation, she was informed without notice that she and Liza Cartegna were to switch

assignments, that is Cartegna was to do priority mail and Duffy was to do the hunt list. *Id.* at ¶ 8. In her deposition, plaintiff conceded that she was not claiming that she was assigned to the hunt list because of her age. Duffy Deposition at 85. Defendant asserts that Cartegna discovered a considerable backlog when she took over the priority mail assignment from Duffy. Murray Affidavit, ¶ 3.

The hunt list clerk receives any mail for which the mail and file clerks cannot find the claim file. The hunt list clerk files this mail sequentially by claim number and then types a list of the claim numbers in this file. This list, usually one or two pages in length, is then distributed to the claims' representatives who indicate which claim files that they have so that the mail can be given to them for filing. When Cartegna was the hunt list clerk, she was able to complete the hunt list on a daily basis and was able to perform additional tasks in the mail room. Warren affidavit, ¶ 3. Plaintiff states that Cartegna could complete the task on a daily basis because she worked overtime. In addition, plaintiff asserts that the hunt list job became more difficult because the volume of mail increased after the Whitestone office opened. Duffy affidavit, ¶ 16.

Plaintiff conceded that she had problems completing the hunt list on a daily basis and acknowledged that "a backlog developed." Duffy Deposition at 270. In describing her problems completing the hunt list in a timely manner, plaintiff stated "I never could get it all done, never," "I wasn't doing it successfully," "I was always behind," and "I just couldn't get the thing out fast enough to satisfy anyone." *Id.* at 73, 286, 77, 523.

On June 25, 1991, Warren sent plaintiff a memo, advising her that the hunt list needed to be completed daily, stating that she "expected to see an improvement in her work production," and inviting her to ask for help. Defendant's Affidavits, Exhibit G. On July 3, 1991, plaintiff did not complete the hunt list and left the partially completed hunt list locked in her desk. Duffy Deposition at 282. Plaintiff later explained that she locked the list in her desk because she "didn't want it to disappear." *Id.* On July 9, 1991, Warren

sent plaintiff another warning memo, stating that she should not have locked the list in her desk, that she must complete the hunt list daily, and that failure to improve her performance could result in "further disciplinary action not excluding recommendation for termination." Defendant's Affidavits, Exhibit H.

On July 9, 1991, plaintiff submitted a proposal to her supervisors, recommending that the hunt list be distributed twice a week instead of daily and that it be automated on a computer program called "Listkeeper." Duffy Affidavit, ¶ 17. Murray allegedly rejected plaintiff's proposal and told her to work on it on her own time. *Id.* at ¶ 17. On July 17, 1991, plaintiff again left for the day without completing the hunt list. Plaintiff stated that she left at 5:00 p.m. that day and that, as far as she knew, other clerks completed the hunt list. Duffy Deposition at 417. On July 24, 1991, plaintiff's supervisors met with her to discuss her proposals. In a memorandum dated July 25, 1991, plaintiff's supervisors agreed that she could distribute the hunt list every other day. Murray Affidavit, Exhibit E.

Plaintiff requested a meeting with Pouch to discuss the every-other-day distribution schedule, and during this meeting, Pouch used a calendar to explain to plaintiff what "every other day" meant. Duffy Deposition at 299. In late August 1991, plaintiff complained to Jay Kelsey, Pouch's supervisor, about the way she was being treated. According to plaintiff, Kelsey looked at the hunt list and commented that he "couldn't believe it took three hours to type this thing." *Id.* at 66. On August 9, 1991, Warren sent plaintiff another warning memorandum, informing her of several deviations from the every-other-day schedule and cautioning her that failure to adhere to the new schedule could result in further disciplinary action. By memorandum dated August 20, 1991, plaintiff was placed on probation for sixty days. In this memorandum, Warren stated "you are not making a significant effort to improve your work product" and warned her that, absent a marked improvement in her performance, further disciplinary action would be taken. Defendant's Affidavits, Exhibit J.

On September 5, 1991, Jackie Dendecker came to the office to train the mail clerks on what to do with out-of-state mail, which was especially relevant to plaintiff's tasks. Murray affidavit, ¶ 5. Plaintiff stated that, during this training, Murray told her that she was not paying attention. Duffy Deposition at 83. As plaintiff stated in her deposition, "Apparently I had turned my back on Jackie." Duffy Deposition at 323. When Murray scolded plaintiff for not paying attention, plaintiff responded that the training was taking time away from the hunt list. *Id.* On another occasion, Murray arranged for a Claims Automation specialist to come to the Bulova office to train plaintiff, but plaintiff said that she would prefer to do the training on another day. Murray Affidavit at ¶ 6.

In September 1991, plaintiff's daughter came to the State Farm office with a note from plaintiff's doctor stating that she needed to take at least a month off because of a heart problem. Wirtz affidavit, ¶ 4, exhibit U. Plaintiff used sick leave until October 30, 1991, and State Farm permitted her to remain on unpaid leave until her return on December 31, 1991. Pouch affidavit, ¶ 2. Plaintiff maintains that Murray's "constant campaign of harassment" forced her to take medical leave in September 1991.

While plaintiff was on medical leave, Shelia Mason assumed responsibility for the hunt list and was able to distribute it in a timely manner. Mason states that she started using Listkeeper as soon as plaintiff went on medical leave and that it was a great success. Mason affidavit, ¶ 12. According to plaintiff, Mason "was not hobbled, as was plaintiff, with a series of picayune additional obstacles." According to defendant, Mason complained that she did not have enough to do and assumed additional tasks. Defendants also assert that, at one point during plaintiff's medical leave, Mason went on vacation, and Giselle Ortega prepared the hunt list on a timely basis. Warren affidavit, ¶ 8. Ortega told Warren that preparing the hunt list every other day was not enough to keep her busy, and she began to assume other duties in the mail and file room. *Id.*

When Murray and Warren learned that plaintiff was planning to return to work, they both recommended to Pouch that plaintiff be terminated based on her performance and her poor attitude. Pouch affidavit, ¶ 3. Pouch agreed and recommended to Jay Kelsey, her superior in New Jersey, that plaintiff be terminated. *Id.; see also* Duffy affidavit, exhibit N (memorandum dated December 20, 1991 from Pouch to Kelsey recapping plaintiff's work record and concluding "it is in the best interest of all concerned that Mary's employment with State Farm be terminated at this time."). Kelsey consulted with State Farm's personnel and legal departments and reported back to Pouch that the consensus was to permit plaintiff to return to work and have one last opportunity to improve her performance and attitude. Pouch affidavit, ¶ 6.

When plaintiff returned from medical leave, she continued to have difficulty distributing the hunt list. On January 2, 1992, Warren sent plaintiff a memorandum reminding her that she remained on probation and informing her that Mason had found bundles of mail at her desk that had never been interfiled and stating that she had never told anyone that she had been unable to interfile this mail. Defendant's Affidavits, Exhibit K. Warren wrote, "Mary, this is not acceptable." *Id.* When Warren handed this memorandum to plaintiff, plaintiff threw it on the ground in a rage and called it "poppycock." Duffy Deposition at 360.

On January 6, 1992, Warren sent plaintiff a memorandum explaining that several claims representatives were complaining that they were receiving the hunt list too late in the day and that, during plaintiff's medical leave, it was always distributed before 1:00 p.m. Defendant's Affidavits, Exhibit L. On January 14, 1992, Warren sent plaintiff a memorandum describing errors in the hunt lists that she had prepared and warning her that future deviation from office procedure would be viewed as insubordination. Defendant's Affidavits, Exhibit M. According to plaintiff, Mason was only allowed to train her on Listkeeper for "little more than a day" and was directed by Murray not to answer any questions plaintiff might have or assist her in any way. Mason affidavit, ¶ 13. In her affidavit, Mason also states that Murray ordered

the entire Mail and File department not to assist plaintiff with the hunt list. *Id.* Plaintiff contends that Murray continued her campaign of harassment by adding "nit-picking requirements" and "time-consuming procedures" to her job.

On February 7, 1992, Pouch, having received authorization to proceed from Kelsey, terminated plaintiff. After plaintiff's termination, Murray found about 1000 pieces of mail in her work area that had never been processed, including summons and complaints and arbitration awards. Murray affidavit at ¶ 12.

In October 1991, while on medical leave, plaintiff filed an age-discrimination charge against State Farm with the NYSDHR. On November 25, 1991, John Groves, corporate counsel for State Farm, filed a three-page response denying plaintiff's charge. After she was terminated in February 1992, plaintiff filed an additional retaliation charge with the NYSDHR. On April 21, 1992, the NYSDHR found no probable cause, concluding that plaintiff was placed on probation due to her poor performance and that she was terminated when it did not improve. Exhibit X. Plaintiff then requested a review of the NYSDHR finding by the EEOC. On July 16, 1992, the EEOC affirmed the finding of no probable cause. Exhibit Y. In their affidavits, Murray, Pouch, and Warren all attested that they did not learn that plaintiff had filed a complaint with NYSDHR until after her termination in February 1992. Murray affidavit, ¶ 14; Warren affidavit, ¶ 13; Pouch affidavit, ¶ 8.

As evidence of age discrimination, plaintiff points to an August 12, 1991 memorandum from Jane Bosshardt of State Farm's Personnel Department, requesting certified copies of plaintiff's birth certificate and her marriage certificate. *See* Duffy affidavit, ¶ 29; exhibit P. Plaintiff did not mention this memorandum in her complaint. Bosshardt made this request as part of a company-wide effort to gather documentation routinely required by State Farm's retirement plan. *See* Bosshardt affidavit, ¶ 2; Exhibit B (June 21, 1991 memorandum to Northeastern Personnel Department from Retirement Benefits requesting evidence of age documents for numerous employees). Bosshardt requested the same information of forty-five other employees in the Northeast region in addition to plaintiff. Bosshardt affidavit, ¶ 4. Bosshardt also stated that she knew nothing about plaintiff's job performance and was in no way involved in or aware of the decision to terminate her. *Id.* at ¶ 5.

## DISCUSSION

### I. ADEA Claim

The Age Discrimination in Employment Act ("ADEA") prohibits an employer from discharging an employee because of her age if she is between forty and seventy years old. 29 U.S.C. § 631(a). An ADEA plaintiff may attempt to prove discrimination by direct evidence, by statistical proof, or through circumstantial evidence. In this case, plaintiff has no direct evidence of discrimination. She does not allege that anybody at State Farm ever made any comments about her age. Nor does plaintiff present any statistical evidence to establish a pattern of discrimination against older people. Plaintiff instead seeks to prove her ADEA claim through circumstantial evidence, and therefore, the familiar three-step analysis from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies. *Johnson v. State of New York,* 49 F.3d 75, 78 (2d Cir.1995).

Under this burden-shifting analysis, an ADEA plaintiff has the initial burden of establishing a prima facie case of discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 503–08, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). In order to establish a prima facie case under the ADEA, plaintiff must demonstrate (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2d Cir.1995).

If plaintiff meets this burden, discrimination is presumed, and the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the discharge. *Gallo v. Prudential Residential Services,* 22

F.3d 1219, 1224 (2d Cir.1994). If the employer proffers, "through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action," *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747 (citations and internal quotations omitted), the presumption of discrimination drops out of the case. *Id.* at 510–12, 113 S.Ct. at 2749. The employer's burden at this stage is one of production, not persuasion. *Id.* at 506–08, 113 S.Ct. at 2747. If the employer carries this burden of production, plaintiff then must show that defendant's articulated reason for its decision is in fact a pretext for discrimination. *Gallo,* 22 F.3d at 1225.

### A. Step 1: Plaintiff's Burden to Establish a Prima Facie Case

 Defendant concedes that plaintiff has established three of the four elements of a *prima facie* case: she is over forty, she was discharged, and she was replaced by a younger person. Defendant, however, argues that plaintiff cannot establish that she was qualified for the position. In satisfying this burden, plaintiff must demonstrate that "her performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge [her]." *Powell v. Syracuse University,* 580 F.2d 1150, 1155 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) (citation omitted).

 In opposing defendant's motion for summary judgment, plaintiff submitted sworn affidavits from herself and a co-worker, Sheila Mason. Although defendant argues persuasively that, based on the affidavits it submitted, plaintiff was not qualified for the position, this is a motion for summary judgment, and the Court is required to draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991). "The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin,* 46 F.3d at 202. Given the numerous, detailed affida-

vits submitted by State Farm, the Court has serious doubts about whether plaintiff was qualified for any position at State Farm. Courts, however, have consistently emphasized the *de minimis* showing required to establish a prima facie case in employment discrimination cases. *See e.g., Cronin,* 46 F.3d at 203–04 (reversing district court's grant of summary judgment on the ground that plaintiff failed to establish a prima facie case and emphasizing that "the showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is *de minimis* "). In light of this caselaw and the affidavits and the exhibits submitted by plaintiff, the Court concludes that plaintiff has demonstrated that she is qualified for the position and therefore has established a prima facie case.

### B. Step 2: Defendant's Burden to State a Legitimate Non–Discriminatory Reason

 Once plaintiff establishes her prima facie case, "the burden shifts to [the employer] to articulate a reason for discharging [Duffy] that, if believed by a trier of fact, would support a finding that unlawful discrimination was not the basis for the employment action." *Sutera v. Schering Corp.,* 73 F.3d 13, 17 (2d Cir.1995). Here, defendant asserts that it terminated plaintiff because of her unsatisfactory job performance and her poor attitude. Defendant submits the affidavits of numerous employees describing in detail plaintiff's unsatisfactory job performance and her bad attitude. In addition, defendant attaches various memoranda that corroborate the affiants' descriptions of plaintiff's problems in performing her job. Based on these affidavits and exhibits, it is clear that defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's termination.

### C. Step 3: Plaintiff's Opportunity to Show Pretext for Discrimination

 Because defendant has proffered a legitimate, non-discriminatory reason for discharging plaintiff, the burden shifts back to plaintiff to prove by preponderance of the evidence that the defendant's proffered rea-

sons were a pretext for discrimination. *Hicks*, 509 U.S. at 515, 113 S.Ct. at 2752. "[A] reason cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515–17, 113 S.Ct. at 2752 (emphasis in original). Thus, the issue for purposes of this summary judgment motion is whether there is a genuine issue of material fact as to whether the reasons proffered by defendant for discharging plaintiff were a pretext for discrimination.

■ In her opposition papers, plaintiff devotes one paragraph to her argument that State Farm's proffered explanation was pretextual, asserting that she was the oldest non-vested employee in the Bulova office, that State Farm was aware of her prior medical history, that the hunt list job was the most difficult task in the mail and file group, that plaintiff was the oldest person in the mail and file group by at least fifteen years, and that State Farm's statistical request for age-related documents evinced a concern about her age. Brief at 14, Duffy affidavit, ¶ 29.

Plaintiff has failed to produce evidence sufficient to support a rational finding that State Farm's proffered reasons were false and that age was the real reason for the discharge. In her one-paragraph effort to challenge defendant's reason, plaintiff makes general assertions and recites vague facts about the Bulova office. The only evidence relied on by plaintiff to challenge defendant's proffered reason is the memorandum from Bosshardt to plaintiff requesting certified copies of her birth and marriage certificates. It is evident that this memorandum is not sufficient evidence to support a rational finding that State Farm's proffered explanation was false and that its true motivation was plaintiff's age. First, Bosshardt stated in her affidavit that she sent similar requests to forty-five other employees in the Northeast region and that she had no knowledge of Duffy's problem with her supervisors. Moreover, courts have consistently recognized that the maintenance of age-related documents does not constitute evidence of age discrimination. *See Wilson v. Firestone*

*Tire & Rubber Co.*, 932 F.2d 510, 514 (6th Cir.1991) (holding that "mere maintenance of [age-related] information, absent direct evidence that it was used in making adverse employment decisions, cannot create even a circumstantial inference of discrimination"); *E.E.O.C. v. MCI Int'l, Inc.*, 829 F.Supp. 1438, 1448 (D.N.J.1993) (holding that employer's maintenance of age-related information for determining eligibility for insurance benefits does not constitute direct evidence of age discrimination).

Plaintiff's conclusory allegations are insufficient to rebut State Farm's proffered reason for the discharge. *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 142 (2d Cir.1993), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) ("[A] Title VII plaintiff does not necessarily meet [her] burden of persuasion by convincing the factfinder that the employer's non-discriminatory explanation is not credible; rather, the trier of fact must find that the plaintiff has proven its explanation of discriminatory intent by preponderance of the evidence."). In *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir. 1994), an ADEA plaintiff established a prima facie case, and the employer articulated a neutral, non-discriminatory reason for the discharge. The evidence submitted by plaintiff included testimony about statements by the plant manager that he thought older employees lacked the aggressive and competitive qualities of younger employees. *Id.* at 109 & n. 2. Affirming the district court's grant of summary judgement in favor of the employer, the Second Circuit acknowledged that plaintiff advanced "some evidence" of age bias in the testimony about the plant manager's statements and reasoned:

> But *some* evidence of age bias is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's age was the real reason for the discharge.

> *Id.* at 109–10 (emphasis in original).

The Court in *Woroski* went on to conclude that "no rational jury could find that [the employer's] decisions to terminate the plaintiffs were motivated by age bias." *Id.* at 110.

In this case, plaintiff has failed to advance *any* evidence of age bias, and therefore no rational jury could find that State Farm's proffered reason was false and its true motivation was age bias. Accordingly, the Court grants defendant's motion for summary judgment on the ADEA claim.

## II. Retaliation Claim

▉▉▉▉▉ Defendant also moves for summary judgment on plaintiff's claim that she was terminated in retaliation for filing an age discrimination complaint with the NYSDHR. In order to establish a prima facie case of retaliation, plaintiff must show that she "engaged in protected activity, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action." *Sands v. Runyon*, 28 F.3d 1323, 1331 (2d Cir.1994) (citations omitted). The *McDonnell Douglas* burden-shifting applies to retaliation claims. *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 208 (2d Cir.1990). Once plaintiff establishes her prima facie case, the burden of production shifts to the employer to articulate a non-retaliatory reason for the discharge. *Id.* at 209. If the employer proffers such a reason, the burden shifts back to the plaintiff to demonstrate that the proffered reason was a pretext for retaliation. *Id.*

▉▉▉ Defendant first argues that plaintiff cannot establish a prima facie case of retaliation. Defendant concedes that plaintiff engaged in a protected activity when she filed a complaint with the NYSDHR and that it took adverse action against her when it terminated her. Defendant, however, argues that plaintiff cannot show that her superiors were aware of her protected activity. In support of this argument, defendant relies on the affidavits of Murray, Pouch, and Warren, in which all three specifically stated that they did not learn that plaintiff had filed a complaint with the NYSDHR until after her termination in February 1992. *See e.g., Bedford v. Southeastern Pennsylvania Trans. Auth.*, 867 F.Supp. 288, 293 (E.D.Pa.1994) ("If the person who decided that plaintiff's employment should be terminated had no knowledge that she had engaged in the protected activity in question, then clearly he could not have retaliated against her for so doing.") (*citing Long v. AT & T Information Systems, Inc.*, 733 F.Supp. 188, 206 (S.D.N.Y.1990)). Defendant also asserts that, if Murray, Pouch, and Warren did not know that plaintiff had filed a complaint with the NYSDHR, she cannot establish a causal link between her protected activity and her termination.

Plaintiff counters that defendant's argument is incredible in light of State Farm's letter to the NYSDHR dated November 25, 1991. Exhibit M. In this letter, John Groves, an attorney in defendant's corporate law department, acknowledged receipt of plaintiff's complaint and stated "State Farm denies that Ms. Murray or anyone else within State Farm management altered Complainant's work duties in an effort to harass or create an excessive employment burden." *Id.* Plaintiff argues that it is "difficult to believe" that State Farm's attorney would make such representations without contacting plaintiff's supervisors.

Although the Court finds plaintiff's assertion that her supervisors must have known about her NYSDHR complaint somewhat speculative, the Court, in the context of this summary judgment motion, must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. Moreover, the Court is mindful of the low threshold that the Second Circuit has imposed on a plaintiff in establishing a prima facie case under the *McDonnell Douglas* analysis. *See, e.g. Gallo*, 22 F.3d at 1225 (emphasizing the *de minimis* burden that a plaintiff faces in establishing a prima facie case). Thus, for purposes of this motion, the Court will infer that plaintiff's supervisors knew that she had lodged a complaint with the NYSDHR. Having inferred that plaintiff's supervisors knew about her NYSDHR complaint, the Court finds that plaintiff has, at least at this stage, demonstrated a causal

link between the filing of the NYSDHR complaint and her termination. Accordingly, the Court concludes that plaintiff has established a prima facie case of retaliation.

The burden then shifts to State Farm to articulate a nonretaliatory reason for plaintiff's discharge. It is clear that State Farm has articulated a nonretaliatory reason for discharging plaintiff, her incompetent work performance and her bad attitude. The burden therefore shifts back to plaintiff to demonstrate that State Farm's proffered reasons were a pretext for retaliation. Under *Hicks,* plaintiff must demonstrate both that the reasons were false and that the employer's true motivation was retaliation. *Hicks,* 509 U.S. at 515–17, 113 S.Ct. at 2752. For the same reasons discussed *supra,* it is clear that plaintiff cannot carry this burden. The evidence submitted by defendant shows that, before plaintiff filed her NYSDHR complaint in October 1991, she was on probation, that her work was being closely monitored, that she received numerous memoranda critical of her work performance, that she had several hostile exchanges with her supervisors, and that she continued to have difficulty performing her tasks competently despite defendant's repeated efforts of accommodation. Because there is no genuine issue of material fact that State Farm's proffered reason for terminating plaintiff was a pretext for retaliation, the Court grants defendant's motion for summary judgment on plaintiff's retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment on both of plaintiff's claims. The Clerk of the Court is directed to close this case.

SO ORDERED.