Theresa SMITH, Plaintiff,

v.

**ALEXANDER & ALEXANDER, INC.,
and Aon Corporation, Defendant.**

No. 97 CIV. 6319(JSR).

United States District Court,
S.D. New York.

Nov. 3, 1998.

Anne L. Clark, Vladeck, Waldman, Elias & Engelhard, P.C. New York, NY, for plaintiff.

Darrell S. Gay, Patricia L. Hardaway, Gay & Hardaway, New York, NY, for defendant.

*MEMORANDUM ORDER*

RAKOFF, District Judge.

Plaintiff Theresa Smith sues her former employer Alexander & Alexander, Inc. ("A & A")[1] for alleged violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), the New York State Human Rights Law, Executive Law § 290 *et seq.*, the Administrative Code of the City of New York § 8–101 *et seq.*, the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Upon completion of discovery, defendants moved for summary judgment. On July 10, 1998, the Court informed the parties telephonically that defendants' motion would be denied. This Memorandum Order will serve to formally confirm that order and briefly describe the reasons therefor.

The pertinent facts, either as undisputed or taken most favorably to plaintiff, show that plaintiff was initially hired by A & A in 1973 as a clerk/typist and rose by 1989 to the level of Vice President of Administration, in which capacity she served as corporate secretary to A & A's Executive Committee and as an assistant to the President/CEO and other members of the Committee. In particular, from October, 1995 to November, 1996 (the period principally implicated in this case), plaintiff chiefly reported to Lawrence Burk, A & A's President and CEO until May 1996, and to Elliot Cooperstone, A & A's Chief Operating Officer in 1995 and then its President and CEO beginning in May, 1996.

In 1990, plaintiff became the foster parent of a child, Ricky, who suffered from severe disabilities, including cerebral palsy, blindness, mental retardation, seizure disorder, and scoliosis. In 1993 plaintiff formally adopted Ricky. In September–October, 1995, when Ricky had to be hospitalized because of a severe respiratory condition, plaintiff took a six-week leave, pursuant to the FMLA, to help care for him. Complaining about her absences to Burk and others, Cooperstone made statements such as: "It is bad enough when something like this happens to somebody, but to choose this, it is not going to be done on my watch." Young Dep. at 66; *see also id.* at 65; Burk Dep. at 72, 94, 96. When plaintiff returned to work, Cooperstone again expressed irritation that she had taken leave. Smith Dep. at 110, 147–48; Smith Aff. at ¶ 14. Shortly thereafter, her job responsibilities, especially those assigned

---

**1.** Co–Defendant Aon Corporation purchased A & A around the time of, or shortly after, plaintiff's termination.

by Cooperstone, began to steadily and materially diminish.

Around the same time, plaintiff submitted a request to Aetna, the administrator of A & A's health insurance plan, for coverage of home nursing care required by Ricky following his release from the hospital. When her application was denied, plaintiff asked for an explanation from Henry Kramer, A & A's Employee Benefits Manager. Kramer falsely told her that A & A's insurance plan had no provision for home nursing care. When, with the help of an advocacy group for disabled children, plaintiff eventually discovered that A & A's insurance plan did, in fact, provide for no less than seventy shifts of such home nursing care per year, Kramer offered another false explanation for Aetna's action. Only after still further confrontations and an appeal to A & A's own Benefits Administration Committee was the applied-for coverage finally obtained.

After Cooperstone became CEO in May, 1996, the diminishment in plaintiff's duties accelerated. In November, 1996, after 23 years at A & A, plaintiff was terminated, chiefly at the behest of Cooperstone.

Against these allegations, defendants move for summary judgment, contending, with respect to all but the ERISA claim, that (1) plaintiff's job responsibilities did not in fact significantly diminish between the time of her return to work and the time of her termination, (2) even if such diminishment arguably occurred, plaintiff has failed to make a *prima facie* showing it was related either to her association with her disabled son or to the fact that she took an FMLA leave, and (3) plaintiff's termination was simply the result of a general downsizing at A & A.

■ As to defendants' first contention, plaintiff has adduced substantial admissible evidence that her job responsibilities, after remaining essentially unchanged for the preceding six years, were materially reduced following her return from leave—including reduced involvement with, *inter alia,* upper management meetings, managing teleconferences, preparing the agenda for Executive Committee meetings, and preparing monthly reports on A & A's field offices—and that

this reduction continued, and, indeed, accelerated thereafter. *See e.g.,* record citations in Pl. Rule 56.1 Statement at pp. 17–23, and in Pl. "Counter–Chart," *passim. See also Blanchard v. Stone Safety Corp.,* 935 F.2d 18, 19 (2d Cir.1991); *Noyer v. Viacom, Inc.,* 1998 WL 226172, at *2–3 (S.D.N.Y. May 5, 1998). Moreover, Cooperstone's own explanation as to why he fired plaintiff—that she was not doing enough work to justify her being kept on, *see* Cooperstone Dep. at 61—inferentially supports her claim that her duties were materially diminished during the relevant period.

As to defendants' second and third contentions, Cooperstone's clear threat to retaliate against plaintiff for "choosing" to adopt a disabled child and thus being obliged to take a six-week leave while "on [his] watch," when coupled with his direct involvement in both the immediate diminishment of her duties and her subsequent termination, is more than sufficient to raise a genuine jury question as to whether these actions were motivated, at least in meaningful part, by the discrimination forbidden by the laws here pertinent. *See, e.g., Sumner v. United States Postal Service,* 899 F.2d 203, 209–211 (2d Cir.1990).

■ The ERISA claim is a somewhat closer call. Section 510 of ERISA, 29 U.S.C. § 1140, makes it unlawful for an employer to

discharge . . . or discriminate against a participant or beneficiary [of an employee welfare plan] for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . , or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

While there is ample evidence from which a jury could infer that A & A's employee Kramer purposefully attempted to prevent plaintiff from obtaining her rightful entitlements under the plan, the fact is that she ultimately obtained them (albeit only with the help of an advocacy group) approximately one year later. Plaintiff's claim, however, is that this evidence shows that part of A & A's motivation in firing her was to retaliate against her for demanding her ERISA enti-

tlements, as well as to obviate having to pay further such entitlements in the future. On balance, it cannot be said that a reasonable juror—after taking account, *inter alia*, of the evidence of defendants' obstructions to plaintiff's prior ERISA request, the more general evidence of discrimination relating to her termination as discussed above, and the fact that plaintiff's termination occurred shortly before Ricky would again become eligible under A & A's insurance plan for another 70 shifts of home nursing care—could not conclude that ERISA-based bias played a role in plaintiff's termination.

Accordingly, defendants' motion for summary judgment is denied in its entirety. The parties are reminded that the trial of this case is firmly set for November 30, 1998 at 9:00 a.m.

SO ORDERED.