Earl BROWN, Plaintiff,

v.

**XEROX CORPORATION, Defendant.**

**6:10–CV–06233 EAW**

United States District Court,
W.D. New York.

Signed March 21, 2016

Charles L. Miller, II, Law Office of Lindy Korn, Lindy Korn, Buffalo, NY, for Plaintiff.

Margaret A. Clemens, Trent M. Sutton, Littler Mendelson, P.C., Fairport, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

### I. INTRODUCTION

Plaintiff Earl Brown ("Plaintiff") brought this action against defendant Xerox Corporation ("Defendant" or "Xerox"), alleging employment discrimination based on his race, and retaliation. Presently before the Court is Defendant's motion seeking summary judgment in its favor. (Dkt.36). Because there are no disputed issues of fact that Defendant neither retaliated nor discriminated against Plaintiff, summary judgment is granted in favor of Defendant.

### II. FACTUAL BACKGROUND

#### A. Plaintiff's History at Xerox and Role as Vice President of Human Resources for XSSG

Plaintiff, an African–American male, was hired by Xerox in 1982 as an Industrial Relations Manager in Xerox's Office Products Division in Dallas, Texas. (Dkt. 36–1 at ¶ 2; Dkt. 47–1 at ¶ 2). Plaintiff subsequently was promoted into several human resources ("HR") positions in various organizations within Xerox. (Dkt. 36–1 at ¶ 3; Dkt. 47–1 at ¶ 3).

In 2004, Plaintiff began reporting to Wim Appelo, with an indirect reporting relationship to William Castle, who was at the time the Vice President of HR for Mr. Appelo's organization. (Dkt. 36–1 at ¶ 5; Dkt. 47–1 at ¶ 5). In June 2005, Plaintiff was promoted by Mr. Appelo and Mr. Castle to the position of Vice President of HR for the Xerox Strategic Services Group ("XSSG"). (Dkt. 36–1 at ¶ 6; Dkt. 47–1 at 6). As Vice President of HR for XSSG, Plaintiff was responsible for providing HR leadership and support to the XSSG organization, and managed a group of individuals who reported to him directly.

(Dkt. 36–1 at ¶ 7; Dkt. 47–1 at ¶ 7). Plaintiff also provided support for both the exempt population and the unionized or industrialized workforce within XSSG. (*Id.*).

Defendant contends that while Plaintiff served as Vice President of HR for XSSG, he sometimes had to take unpopular positions to safeguard the rights of protected classes of individuals. (Dkt. 36–1 at ¶ 32). Among those activities identified by Plaintiff are the following:

- developed a Band 00B Vice Presidential titling process for the organization and implemented it for the business, and attended meetings with employees in the organization about the process;
- worked on a team of HR professionals with respect to the launching of the "Lominger model" as an assessment tool to determine opportunity and development areas for certain employees within XSSG, and brought his concerns relating to the use of that model to the attention of Ursula Bums, the CEO of Xerox, on or about March 30, 2007;
- met with Mr. Appelo and another manager, Ken Syme, on September 3, 2008, concerning a workplace violence incident between two female coworkers named Doreen Alfieri and Margaretta Williams; and,
- raised concerns about the lack of promotions on behalf of various employees.

(*See* Dkt. 36–1 at ¶¶ 33–37). In his statement of facts opposing summary judgment, Plaintiff admits that he was acting within the scope of his job duties when undertaking all of the above activities, except when he "went above and beyond his job duties in his persistent fight against discriminatory practices" (Dkt. 47–1 at ¶ 32) and, with respect to speaking to CEO Ursula Bums regarding the Lominger model, he "was acting as a concerned individual, not in his capacity as an HR employee" (Dkt. 47–1 at ¶ 35; *see also* Dkt. 40–3 at 350:16–20).

## B. The 2007 Employee Engagement Survey

In 2007, Plaintiff received a score of 42 percent on the Employee Engagement Survey ("EES"), which is an anonymous employee satisfaction survey conducted by Xerox, in which employees are asked to answer questions relating to their level of satisfaction or dissatisfaction with their jobs, managers, or Xerox itself. (Dkt. 36–1 at ¶¶ 10–11; Dkt. 47–1 at ¶¶ 10–11). Defendant contends that Plaintiffs score was the lowest among Xerox managers in the XSSG organization reporting to Mr. Appelo in the area relating directly to management of people. (Dkt. 38 at ¶ 13; Dkt. 39 at ¶ 11). Defendant further contends that Plaintiff scored lower as a people manager as compared to Mr. Appelo's other direct reports. (*Id.*). Plaintiff contends that the 2007 EES score does not accurately reflect his performance. (Dkt. 47–1 at ¶ 11; Dkt. 40–2 at 225:11–226:24).

Defendant contends that Mr. Appelo had a roundtable meeting with Plaintiff's direct reports on October 12, 2007, to discuss Plaintiff's EES scores. (Dkt. 36–1 at 12; *see also* Dkt. 38 at ¶ 16; Dkt. 39 at ¶ 15). Plaintiff also met with his direct reports to develop and implement an action plan to address his management issues. (Dkt. 40–2 at 225:11–20). Plaintiff contends that Mr. Appelo told him "not to worry," and never issued a summary of the October 2007 meeting. (Dkt. 47–1 at ¶ 12; Dkt. 40–2 at 227:8–16).

## C. History of Complaints Against Plaintiff

Xerox management received complaints from Plaintiff's direct reports, some of whom are African–American, including: (1) Shirley Black, who filed a Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Plaintiff created a hostile work environment based on gender; and (2) Loretha McCullough, who testified that she had complained to Patricia Nazemetz, Corporate Vice President, Chief HR Officer for Defendant, and others that Plaintiff was intimidating. (Dkt. 36–1 at ¶ 13; *see also* Dkt. 37 at ¶ 12; Dkt. 39 at ¶ 14). Plaintiff denies creating a hostile work environment. (Dkt. 47–1 at ¶ 13).

Defendant contends that Mr. Appelo met with Plaintiff in several one-on-one meetings, where Mr. Appelo informed Plaintiff that he was perceived as intimidating by some employees, but Plaintiff failed to accept these complaints or change his behavior in response to the complaints. (Dkt. 36–1 at ¶¶ 14–15; *see also* Dkt. 38 at ¶ 18; Dkt. 39 at ¶ 13). Plaintiff denies that the meetings with Mr. Appelo were to discuss complaints lodged against him, and while conceding that his personal stature and mannerisms made him "naturally intimidating", he denies that he was indifferent to employee complaints. (Dkt. 47–1 at ¶¶ 14–15; *see also* Dkt. 40–3 at 253:10–254:21).

### D. *Xerox Engages Charles Story*

In January 2008, Xerox engaged Charles Story, President of ECS Group, Inc., to work with Plaintiff for a 12–month coaching engagement. (Dkt. 36–1 at ¶¶ 16–17; Dkt. 47–1 at ¶¶ 16–17).

Mr. Story met with Plaintiff and conducted interviews with individuals, including Plaintiff's supervisors, peers, and staff, to obtain an understanding of Plaintiff s strengths and development opportunities so that he could work with Plaintiff to craft a development plan. (Dkt 36–1 at ¶ 18; Dkt. 47–1 at ¶ 18). Mr. Story ultimately advised Plaintiff of five major areas of concern, including: (1) quality of communication; (2) being too process-oriented; (3)

"If if s not my idea, it's not going to happen"; (4) lack of trust in and engagement of staff; and (5) building relationships and a "sense of team." (Dkt. 36–1 at ¶ 19; Dkt. 47–1 at ¶ 19). Defendant contends that Plaintiff did not believe that the information relating to these five areas of concern was accurate and concluded that Mr. Story was "useless." (Dkt. 36–1 at ¶ 20). Plaintiff argues that he was not indifferent to the feedback provided by Mr. Story, but concluded that he was "useless" because he "would not give his opinion" relating to Plaintiff's improvement. (Dkt. 47–1 at ¶ 20; *see also* Dkt. 40–2 at 231:2–232:19).

Defendant further contends that Plaintiff failed to review with Mr. Appelo the template development plan provided by Mr. Story, despite Mr. Story's requests that he do so. (Dkt. 36–1 at ¶ 21; *see also* Dkt. 40–3 at 255:20–23, 258:3–15). Plaintiff contends that he planned to discuss the template with Mr. Appelo but wanted to meet with Mr. Story before doing so. (Dkt. 47–1 at ¶ 21; Dkt. 40–3 at 257:22–25).

On May 9, 2008, Plaintiff sent Mr. Appelo and others at Xerox an e-mail asking them to complete another feedback survey. (Dkt. 36–1 at ¶ 22; Dkt. 47–1 at ¶ 22). Defendant contends that, at around that same time, Mr. Story reported to Mr. Appelo and Ms. Nazemetz that he was frustrated with Plaintiff's failure to submit a development plan, lack of commitment to the coaching process, and unwillingness to work with him. (Dkt. 36–1 at ¶ 23; *see also* Dkt. 38 at ¶ 27; Dkt. 39 at ¶ 22). Mr. Story requested that Xerox release him from his contract. (*Id.*).

### E. *Plaintiff's Transfer*

In September 2008, Plaintiff was moved to another Band 00A position reporting to Mr. Castle, who was at the time Vice

President of Xerox's Corporate HR. (Dkt. 36–1 at ¶ 8; Dkt. 47–1 at ¶ 8). Plaintiff contends that this new position was not commensurate with a Band 00A position, and it involved "no job" with only "menial tasks". (Dkt. 47–1 at ¶ 8; Dkt. 40–2 at 40:17–41:12, 63:1–7). Plaintiff also contends that his bonus pay and stock were cut, his office was significantly reduced in size and quality, and he was denied assigned parking. (Dkt. 47–1 at ¶ 8; Dkt. 40–2 at 15–18). The decision to reassign Plaintiff was made by Mr. Appelo and Ms. Nazemetz. (Dkt. 36–1 at ¶ 9; Dkt. 47–1 at ¶ 9).

Plaintiff did not make any internal complaints of race discrimination at Xerox (Dkt. 36–1 at ¶ 30; Dkt. 47–1 at ¶ 30), and he did not make any internal complaints of retaliation for engaging in protected activity (Dkt 36–1 at ¶ 31; Dkt. 47–1 at ¶ 31). The parties agree that during the relevant time period, Defendant had in place policies prohibiting discrimination based on race and prohibiting retaliation against individuals engaged in protected activity under Title VII. (Dkt. 36–1 at 1; Dkt. 47–1 at ¶ 1).

### F. *Plaintiff's January 2009 EEOC Charge*

On or around January 16, 2009, Plaintiff filed a Charge of Discrimination with the EEOC against Xerox. (Dkt. 36–1 at ¶ 26; Dkt. 47–1 at ¶ 26; *see also* Dkt. 40–4). The EEOC investigated Plaintiff's allegations and on January 28, 2010, issued a notice and determination letter, finding that there was no probable cause to believe that any discrimination or retaliation had occurred. (Dkt. 36–1 at 27; Dkt. 47–1 at ¶ 27; *see also* Dkt. 40–6). Thereafter, Plaintiff commenced this action on April 28, 2010, by filing a summons and complaint. (Dkt. 36–1 at 28; Dkt. 47–1 at ¶ 28).

### III. *PROCEDURAL HISTORY*

Plaintiff filed his federal complaint on April 28, 2010. (Dkt.1). On July 1, 2010, Defendant filed a partial motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt.4). By Decision and Order entered March 4, 2013, United States District Judge Charles J. Siragusa, to whom this case was previously assigned, dismissed the following claims: (1) Plaintiff's first and third causes of action alleging discrimination and retaliation claims, to the extent based upon the termination of Plaintiff's employment in 2010, because Plaintiff failed to exhaust administrative remedies; and (2) Plaintiff's hostile work environment claim as alleged in the second cause of action, because it failed to plausibly state a claim. (Dkt.15). Plaintiff filed a motion for reconsideration on April 1, 2013 (Dkt.16), which Judge Siragusa denied (Dkt.18). Thus, the only remaining claims are Plaintiff's discrimination and retaliation claims based upon the removal of Plaintiff in September 2008, from his position as Vice President of HR for XSSG.

On February 18, 2014, the matter was transferred to the undersigned. (Dkt.28). Defendant filed the instant motion for summary judgment on April 9, 2015, seeking dismissal of Plaintiff's remaining claims. (Dkt.36). Plaintiff filed a response on June 12, 2015 (Dkt.47), and Defendant replied on August 28, 2015 (Dkt.50). Oral argument was held on December 8, 2015, and the Court reserved decision on the motion. (Dkt.52).

In support of its motion for summary judgment, Defendant has submitted voluminous exhibits and sworn testimony, including affidavits from Mr. Appelo, Ms. Nazemetz, Timothy Conlon (VP of HR at Xerox), and Elly Chiariello (Procurement Specialist in Global Procurement at Xerox) (Dkt. 36–3 & Dkt. 37–39), and deposition testimony of Plaintiff, Mr. Story, and Ms.

McCullough (Dkt. 40–2; Dkt. 40–3; Dkt. 40–10; Dkt 40–11). In response, Plaintiff submits portions of the depositions of Plaintiff, Ms. McCullough, Ms. Bums, Jeffrey Hammond (Xerox employee), and Mr. Story. (Dkt.47–3). Plaintiff does not submit any factual affidavits opposing Defendant's motion.

## IV. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec.*, 475 U.S. at 586–87, 106 S.Ct. 1348) (emphasis in original). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

## V. PLAINTIFF'S RETALIATION CLAIMS

Title VII makes it unlawful to retaliate against an employee " 'because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' " *Deravin v. Kerik*, 335 F.3d 195, 203 (2d Cir.2003) (quoting 42 U.S.C. § 2000e–3(a)). Retaliation claims are analyzed under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This analysis provides that "[o]nce the employee has established a *prima facie* case, the employer 'must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the [employee] to demonstrate pretext.' " *Verga v. Emergency Ambulance Serv.*, 98 Empl. Prac. Dec. (CCH) P45,204, 2014 WL 6473515, at *3, 2014 U.S. Dist. LEXIS 161512, at *9 (E.D.N.Y.2014) (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 94–95 (2d Cir.2001)).

### A. Prima Facie Case

■ "To establish a *prima facie* case of unlawful retaliation under Title VII, 'an employee must show that (1) he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action.' " *Rivera v. Rochester Genesee Regional Transp. Authority*, 743 F.3d 11, 24 (2d Cir.2012) (citation omitted). Defendant does not contest, for purposes of this summary judgment motion, that Plaintiff suffered a materially adverse action when in September 2008, he was removed

from the position of Vice President of HR for XSSG and transferred to another Band 00A position. At issue on this motion is whether Plaintiff engaged in protected activity of which Defendant had notice, and whether there is a causal connection between any protected activity and the adverse action.

### 1. *Protected Activity*

Plaintiff concedes that he did not personally complain about discrimination or retaliation directed towards him. (Dkt. 36–1 at ¶¶ 30–31; Dkt. 47–1 at ¶¶ 30–31; Dkt. 40–2 at 128:23–129:2; Dkt. 40–3 at 379:9–12, 382:9–12). Rather, Plaintiff relies upon his alleged advocacy on behalf of other employees in support of his claimed protected activity. (Dkt. 47 at 15). *See Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir.2012) (section 704(a) of Title VII includes "both an opposition clause and a participation clause").

The Second Circuit Court of Appeals has addressed the "protected activity" prong of the *prima facie* case as it applies specifically to individuals holding HR positions. In *Littlejohn v. City of N.Y.*, 795 F.3d 297 (2d Cir.2015), the Second Circuit Court of Appeals clarified when a HR employee can be said to have engaged in protected activity for purpose of a retaliation claim;

> To the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity under § 704(a)'s opposition clause, because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII. But if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively "support[s]" other employees in asserting their Title VII rights or personally "complain[s]" or is "critical" about the

"discriminatory employment practices" of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause.

*Id.* at 318 (quoting *Sumner v. U.S. Postal Svc.*, 899 F.2d 203, 209 (2d Cir.1990)). The Second Circuit made a distinction between an HR supervisor simply transmitting or "conveying others' complaints of discrimination" as compared to complaining about what the supervisor personally believed was unlawful discrimination directed at others. *Id.* at 319. According to the Second Circuit, the latter " 'virtually always constitutes' opposition notwithstanding the employee's underlying job responsibilities." *Id.* at 318 (quoting *Crawford v. Metro. Gov't of Nashville and Davidson Cnty.*, 555 U.S. 271, 276, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009)).

In other words, the question as to whether the activity falls within the scope of protected activity, according to the Second Circuit, does not depend upon whether the activity is taken within the scope of a plaintiff's job responsibilities. An HR manager may act within the scope of his duties and yet still engage in protected activity, depending on the circumstances, such as when he is personally advocating his beliefs that discrimination occurred. *See also Ezuma v. City Univ. of N.Y.*, 665 F.Supp.2d 116, 124 (E.D.N.Y.2009) ("The only workable test is to examine the motivation of the reporting employee and determine if he was being an advocate for the alleged victim, or acting with the purpose of supporting his employer, i.e., being a 'good corporate citizen' in making the report. That is going to be a question of fact unless the facts permit no reasonable conclusion other than that the employee was pursuing his organizational role."), *aff'd*, 367 Fed.Appx. 178 (2d Cir.2010).

Here, Plaintiff argues in opposition to Defendant's motion for summary judgment

that he engaged in protected activity when he "worked against Xerox to obtain promotions for minorities, even though their managers would fail to submit them." (Dkt. 47 at 10). Plaintiff cites as examples his efforts to advocate for four individuals—Dan Robinson, Jessie Allen, Valerie Anderson and Jennifer Allen. (*Id.*). Plaintiff also contends that he engaged in protected activity on behalf of other employees when he argued against the "Lominger model," ultimately going to CEO Ursula Burns to voice his concerns. (*Id.* at 10–11). Furthermore, although not expressly referenced in Plaintiffs opposition papers as protected activity, Plaintiff also cites to his efforts in connection with the "VP titling" process. (*Id.* at 7–8). At oral argument, Plaintiff's counsel agreed that those three areas of conduct were the extent of Plaintiff s alleged protected activity.

### Seeking Promotions for Employees

■ Plaintiff admits that he was acting within the scope of his job duties when raising concerns on behalf of several employees such as Jessie and Jennifer Allen. (Dkt. 47–1 at ¶ 37). Indeed, Plaintiffs managers at Xerox similarly maintain that assisting employees in obtaining promotions was a part of Plaintiffs responsibility as Vice President of HR for XSSG. *See* Dkt. 37 at ¶ 17 (taking "unpopular" positions to safeguard the rights of minorities or intervene on behalf of others, is "part and parcel" of the job responsibilities of a Vice President of HR); Dkt. 38 at 36 (fact that Plaintiff intervened on behalf of Loris McFadden, Jessie Allen, and/or other minority employees was not a factor in removing him from his position, and "[a]lthough Plaintiff would, from time to time, intervene on behalf of employees, I expected him to do so given his role as Vice President of HR for XSSG").

Nonetheless, Plaintiff contends that his advocacy on behalf of these employees constituted protected activity, and under the standard announced in *Littlejohn*, whether Plaintiff was acting within the scope of his job responsibilities is not the determinative factor. Rather, the critical inquiry, as discussed above, is whether Plaintiff was actively supporting other employees in asserting their Title VII rights and/or personally complaining about discriminatory employment practices. Here, the record is far from clear that Plaintiff was actually supporting these employees in asserting their Title VII rights or complaining about alleged discrimination.

For instance, Plaintiff testified that Dan Robinson sought to be promoted, but he was unable to obtain a promotion due to his race. (Dkt. 47–3 at 189:4–24). Plaintiff testified that he made "efforts on [Mr. Robinson's] behalf" to try to get him promoted, but he was unsuccessful. (*Id.* at 190:6–10). However, there is nothing in the record suggesting that Plaintiff actually complained of discrimination or conduct prohibited by Title VII on behalf of Mr. Robinson. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir.2011) (protected activity to support retaliation claim must involve complaints that are not generalized, but rather complaints that the employer could reasonably understand involves conduct prohibited by Title VII); *Risco v. McHugh*, 868 F.Supp.2d 75, 110 (S.D.N.Y.2012) ("informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII").

With respect to Jessie Allen, another African–American employee, Plaintiff testified that Mr. Allen sought employment in a Band B level position, and that Plaintiff believed he should be moved into a Band B position. (Dkt. 47–3 at 190:11–192:13). However, as with Mr. Robinson, there is nothing in the record suggesting that

Plaintiff actually complained of discrimination or conduct prohibited by Title VII on behalf of Mr. Allen. Plaintiff's complaint makes some allegations concerning Mr. Allen, including that Mr. Allen received a performance improvement notice by his manager with which Plaintiff was concerned so he informed Mr. Appelo (Dkt. 1 at ¶¶ 20–21), but of course, allegations in a complaint cannot be used to defeat a properly supported summary judgment motion. *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir.1981) ("a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover."). Moreover, even if the allegations in the complaint are considered with respect to Mr. Allen, there is still nothing in the record to suggest that Plaintiff actually complained of discrimination or conduct prohibited by Title VII on behalf of Mr. Allen.

With respect to Valerie Anderson, Plaintiff testified that she was an employee in the global purchasing organization who was "locked into a job" and that she was not being considered for other jobs. (Dkt. 47–3 at 192:14–16, 193:10–196:4). However, again, there is nothing in the record reflecting what Plaintiff purportedly did for Ms. Anderson, let alone any evidence that Plaintiff complained that Ms. Anderson's rights under Title VII had been violated.

With respect to Jennifer Allen, Plaintiff testified that he assisted Ms. Allen, a "premier" hire from Kodak, in obtaining a promotion after having been denied one. (*Id.* at 197:14–199:8). Plaintiff testified that he was "blessed out for putting her promotion in" (*id.* at 199:4–5), but again, there is nothing in the record supporting the notion that Plaintiff actually complained that

Ms. Allen's rights under Title VII had been violated.

Finally, although not referenced in his opposition to the summary judgment motion, in his complaint Plaintiff alleges that he intervened on behalf of Loris McFadden, whose job had been eliminated, and Defendant refused to find an opening for her, despite her good performance. (Dkt. 1 at ¶ 22). Plaintiff contends that once he intervened, Defendant created a position for Ms. McFadden. (*Id.*). Again, however, allegations in a complaint are not sufficient to oppose a summary judgment motion, and in addition, there is nothing in the record suggesting that Plaintiff complained that Ms. McFadden's Title VII rights had been violated.

Plaintiff bears the burden to show by a preponderance of the evidence that he engaged in protected activity. *Sumner*, 899 F.2d at 208 ("Plaintiffs bear the burden of proving, by a preponderance of the evidence, a prima facie case of discrimination."). Here, Plaintiff has failed to demonstrate that his purported advocacy on behalf of minority employees to receive promotions fell within the scope of protected activity. There is nothing in the record suggesting that Plaintiff complained that any of these employees' Title VII rights had been violated or that they had been discriminated against. Rather, the record evidence simply reflects that Plaintiff, in his role as an HR Vice President, pushed for certain employees to receive promotions. That is insufficient to establish protected activity to pursue a retaliation claim. Advocating for certain minority employees to be promoted cannot, without more, be equated with protesting alleged race discrimination.

### Lominger Model

■ Plaintiff contends that he engaged in protected activity when he advocated against implementation of the Lominger

model[1] for economic decisions due to concerns about its negative impact on "blacks and other minorities and older workers" (Dkt. 40–3 at 350:16–20), and that· he went outside the scope of his duties as a FIR manager when he spoke directly to CEO Ursula Burns regarding the dangers of implementing the Lominger model for making economic decisions as the plan had the potential to be implemented in a discriminatory fashion (Dkt. 40–2 at 136:5–8; 137:3–7). Plaintiff testified that Ms. Burns responded to his concerns by indicating "[t]hat's why I've got you and Bill Castle here" (*id.* at 137:8–9), and then Plaintiff told Ms. Bums that he would "take it from here" (*id.* at 137:11–12), whereupon Plaintiff returned to the HR organization and explained that Ms. Bums had confirmed that they were not going to use the Lominger model for economic decisions (*id.* at 127:14–19). Plaintiff contends that Mr. Appelo did not respond favorably to Plaintiff talking to "his boss" without letting him know (*id.* at 138:3–12), and that as a result of his directly going to speak with Ursula Bums, he got "absolutely creamed out" by Mr. Appelo (*id.* at 138:11–12).

Utilizing the standard set forth in *Littlejohn*, the Court cannot conclude that Plaintiffs advocacy against the Lominger model constituted protected activity, or that Plaintiff going over Mr. Appelo's head to talk to his boss about his concerns about the use of the Lominger model constituted protected activity. Rather, even according to Plaintiff's version of events, he was expressing concerns in his role as a Vice President of HR as a "good corporate citizen" about the potential discriminatory impacts of a particular process that the company was considering implementing. *See Cooper v. N.Y.S. Dep't of Labor*, 128 Fair Empl.Prac.Cas. (BNA) 278, 2015 WL

5918263, at *6, 2015 U.S. Dist. LEXIS 138029, at *16–17 (N.D.N.Y.2015) (where the plaintiff alleged facts plausibly suggesting that she "personally complained" of, and was "critical" about, the proposed changes to complaint-handling procedures within state agencies, denying retaliation claim, as the plaintiff merely alleged that she advised these entities, as part of her job duties, that the changes were in conflict with federal regulations regarding nondiscrimination).

In the Court's view, Plaintiff's expressed concerns about the Lominger model fall into the category of fulfilling Plaintiff's job duties to report on potential discrimination, which does not ·constitute protected activity under *Littlejohn*, as opposed to actively supporting other employees in asserting their Title VII rights or personally complaining about discriminatory employment practices. In other words, the Court does not believe that a reasonable jury could conclude that Plaintiffs involvement in the Lominger model satisfies Plaintiffs burden of demonstrating by a preponderance of the evidence that he was engaged in protected activity.

### VP Titling Process

Plaintiff contends that "[i]n late 2007 or early 2008, [he] helped implement a process for providing higher titles to Band B employees without any changes, essentially giving them the title of 'Vice President' without an increase in pay or benefits." (Dkt. 47 at 7). When the process was implemented, "not a single black employee was afforded a new title" and therefore, the upset employees "organized themselves and began to 'push back.'" (*Id.*). Ultimately, a meeting was organized with the employees, but at the meeting Mr. Appelo "blew up" and told the employees

---

**1.** Plaintiff described the Lominger model as a tool provided by an outside vendor to Xerox to help with the process of identifying employees with high potentials and move them through the organization. (Dkt. 40–2 at 133:3–134:3).

they were "looking for entitlements." (*Id.* at 7–8). As a result, a second meeting was held without Mr. Appelo, at which Plaintiff was able to help the employees understand the issue. (*Id.* at 8).

Plaintiff testified that there was no discrimination in terms of the process of assigning VP titles to minorities, but rather he felt that discrimination occurred in connection with the comments by Mr. Appelo to employees that they were "looking for entitlements." (Dkt. 40–2 at 129:11–130:5).

Again, however, as with his claims regarding the advocacy for promotions of employees and his concerns about the Lominger model, Plaintiff fails to cite to any activity on his part in connection the VP Titling Process where he personally complained that employees' Title VII rights were being violated.

### *Incidents in Complaint*

■ Finally, although not referenced in opposition to the summary judgment motion as protected activity. Plaintiff also references in his complaint to an incident on July 16, 2008, involving a confrontation between a white employee, Doreen Alfieri, and her manager, Margaretta Williams, an African–American female. (Dkt. 1 at ¶ 17). Following an investigation by HR, the recommendation was made that Ms. Alfieri be disciplined, with no discipline recommended for Ms. Williams. (*Id.* at ¶ 18). According to Plaintiff's deposition testimony, he did not personally conduct the investigation or make the recommendation. Rather, that was done by HR Manager JoAnn Howard. (Dkt. 40–2 at 120:4–6; 121:12–13). In addition, security conducted part of the investigation. (*Id.* at 121:20–25). Plaintiff testified that his involvement with the incident was related to his role as VP of HR. (*Id.* at 127:10–13). After HR made the recommendation that Ms. Alfieri be disciplined, with no corresponding discipline for Ms. Williams,

Plaintiff contends that he was confronted in a meeting on September 3, 2008, by Ken Syme and Mr. Appelo who urged him to overrule the recommendation, but Plaintiff rejected their requests. (Dkt. 1 at ¶ 19).

The Court concludes that there is no issue of material fact concerning this incident involving Ms. Alfieri and Ms. Williams. There is nothing in the record suggesting that Plaintiff was doing anything other than relaying and supporting a recommendation for employee corrective action, after an investigation by HR, in his role as VP of HR. There is nothing in the record suggesting that Plaintiff's role in connection with this incident amounted to protected activity in the form of advocacy on behalf of a minority employee or voicing Plaintiff's personal beliefs of discrimination.

### 2. *Causation*

Notwithstanding the Court's conclusion that Plaintiffs attempt to establish a *prima facie* case fails because Plaintiff did not engage in protected activity, even if the Court found otherwise, Plaintiff's *prima facie* case would still fail because Plaintiff cannot establish causation between the activities that Plaintiff claims were protected and the adverse action. In other words, even if the activities cited by Plaintiff constituted protected activity, Plaintiff's attempt to establish a *prima facie* case still must fail because he cannot meet his burden to show causation between any of the alleged protected activities and the removal of Plaintiff from his position in September 2008.

■ "Proof of a causal connection between the protected activity and adverse action 'can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Valleriani v. Route 390 Nissan LLC,* 41 F.Supp.3d 307, 321 (W.D.N.Y.2014) (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000)). Plaintiff presents no evidence of retaliatory animus or other circumstantial evidence such as disparate treatment of similarly situated employees. Rather, as Plaintiff's counsel acknowledged at oral argument, Plaintiff relies solely on proximity in an effort to establish causation.

■ Here, the record indicates that by September 2, 2008, a decision had been made by Mr. Appelo and Ms. Nazemetz to remove Plaintiff from his position (Dkt. 38 at ¶ 33; Dkt. 38–12), and this decision was communicated to Plaintiff on September 4, 2008 (Dkt. 38 at ¶ 33). In comparison, the VP Titling Process issue arose in late 2007 or early 2008 (Dkt. 40–2 at 74:10–13), and the meeting with Ms. Bums concerning the Lominger model occurred on March 30, 2007 (Dkt. 40–3 at 295:15–17). In other words, with respect to these alleged protected activities, Plaintiff's purported advocacy occurred some nine to eighteen months before any adverse action. This is simply too remote to support a *prima facie* case of causation based on temporal proximity. *See Harrison v. US. Postal Serv.,* 450 Fed.Appx. 38, 40–41 (2d Cir.2011) ("even '[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close'") (citation omitted). This is particularly the case where Plaintiff testified that throughout his career with Defendant he engaged in this type of advocacy by raising these types of issues to safeguard the rights of minorities. (Dkt. 40–3 at 266:15–268:21).

With respect to the alleged advocacy on behalf of employees concerning promotions, much of the activity relied upon by Plaintiff simply contains no date references, and therefore, cannot be used to support a finding of causation through temporal proximity. Plaintiff does allege in his complaint that Jessie Allen's name came up at a meeting on September 3, 2008, when the issue concerning the altercation between Ms. Alfieri and Ms. Williams. was discussed. (Dkt. 1 at ¶¶ 19–20). However, by that date, the decision had already been made to remove Plaintiff from his position, thus negating any causal connection even if there was credible evidence in the record about what occurred at the meeting on September 3, 2008. *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.,* 974 F.Supp.2d 240, 262 (S.D.N.Y. 2013) ("[i]t is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity,") (citing *Slattery,* 248 F.3d at 95); *see also Webb v. Niagara Cnty.,* No. 11–CV–192S, 2012 WL 5499647, at *3, 2012 U.S. Dist. LEXIS 161687, at *8–9 (W.D.N.Y. Nov. 12, 2012) (decision to reassign the plaintiff was not retaliatory because it was made before protected activity).

### B. *Pretext*

Even if Plaintiff could carry his burden of establishing a *prima facie* case of retaliation, it is apparent based upon a review of the record that summary judgment must be granted in favor of Defendant because Defendant has offered legitimate, non-retaliatory reasons for the removal of Plaintiff from his position, and Plaintiff cannot meet his ultimate burden of establishing that his protected activity was the "but-for" cause of Defendant's decision to remove Plaintiff from his position. In other words, Plaintiff cannot prove "that the un-

lawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* —— U.S. ——, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013).

■ "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan v. Andalex Grp., LLC,* 737 F.3d 834, 846 (2d Cir.2013). "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Id.* at 847.

■ Here, as discussed in further detail in Part VI(B) of this Decision and Order, Defendant offers substantial evidence concerning various issues with Plaintiffs performance, from complaints of discrimination and intimidation by other employees, poor scores on the EES, and the failure to remedy these issues through an outside coach. (*See* Dkt. 38 & 39). While Plaintiff disputes the legitimacy of the poor scores and complaints by employees, as well as the "usefulness" of the coach, he does not credibly dispute that these problems were reoccurring and Defendant attempted to address them. (*See* Dkt. 47–1 at ¶¶ 11, 13, 16, 17).

In other words, there can be no question that Defendant has offered legitimate, non-discriminatory reasons for its actions in removing Plaintiff from his position. In response, Plaintiff wholly fails to present evidence to establish that "but for" retaliation for Plaintiff's alleged protected activities, he would not have been removed from his position.

## VI. *Plaintiff's Race Discrimination Claims*

Plaintiff contends that, in addition to unlawful retaliation, he was subjected to race discrimination when he was removed from his position as Vice President of HR for XSSG. Pursuant to Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Employment discrimination claims brought pursuant to Title VII are analyzed under the *McDonnell Douglas Corp. v. Green* burden-shifting framework. As explained above, under this standard, the initial burden is on Plaintiff to establish a *prima facie* case of discrimination. If Plaintiff is able to establish a *prima facie* case, the burden shifts to Defendant to show a legitimate, non-discriminatory reason for its employment decision. Finally, if Defendant makes this showing, the burden shifts back to Plaintiff to establish that the non-discriminatory rationale offered by Defendant is a pretext for discrimination, *McDonnell Douglas Corp.,* 411 U.S. at 802–05, 93 S.Ct. 1817.

### A. *Prima Facie Case*

■ In support of his race discrimination claim, Plaintiff contends that other minorities in his department were not being promoted (Dkt. 40–2 at 83:19–84:5; Dkt. 47–3 at 71:9–12), and that he himself was discriminated against because he was demoted from his position as Vice President of HR for XSSG, to a Band 00A position supporting Mr. Castle (Dkt. 1 at ¶¶ 23–25, 38; Dkt. 47 at 26). He also contends that Mr. Appelo treated African-American women inappropriately, and cites specifically to Mr. Appelo's alleged belief that certain programs aimed at these women were unnecessary. (Dkt. 47 at 10).

"To state a claim for either denial of promotion or demotion based on race,

plaintiff must allege at least some facts suggesting that she is a member of a protected class, that she was either denied a promotion for which she applied or was demoted, that she was qualified for the position and that the circumstances surrounding that action permit an inference of discrimination." *King v. U.S. Sec. Assocs.,* No. 11 Civ. 4457(DAB)(MHD), 2012 WL 4122025, at *6, 2012 U.S. Dist. LEXIS 133339, at *14 (S.D.N.Y. Aug. 22, 2012), *adopted,* 2012 WL 4327396, 2012 U.S. Dist. LEXIS 133345 (S.D.N.Y. Sept. 18, 2012). Defendant argues that even if Plaintiff is able to establish the first three elements of a *prima facie* case, he is unable to show that the alleged discrimination occurred under circumstances warranting an inference of discrimination. (Dkt. 36–2 at 40).

"Inference of discrimination is a flexible [standard] that can be satisfied differently in differing factual scenarios. No one particular type of proof is required to show that Plaintiffs termination occurred under circumstances giving rise to an inference of discrimination. An inference of discrimination can be drawn from circumstances such as the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action], or by showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." *Setelius v. Nat'l Grid Elec. Servs. LLC,* No. 11–CV–5528 (MKB), 2014 WL 4773975, at *9, 2014 U.S. Dist. LEXIS 134789, at *29–30 (E.D.N.Y. Sept. 24, 2014) (internal quotations and citations omitted) (alterations in original).

Plaintiff has failed to show an inference of discrimination. Namely, Plaintiff has offered no evidence of direct racial dis-crimination, *i.e.,* racial comments, epithets, or slurs made against him. Indeed, not even Plaintiff's complaint contains such allegations. (*See* Dkt. 1 & Dkt. 47–3 at 2). Further, Plaintiff has failed to offer any evidence that similarly-situated employees were treated more favorably than him. Instead, Plaintiff has offered conclusory assertions of racial prejudice, which are insufficient to oppose summary judgment. For example, Plaintiff contends generally that "Xerox prevented the promotions of several African–American employees, many within the department Brown worked," and that there is evidence of Mr. Appelo's prejudice toward African–American employees. (Dkt. 47 at 26). However, Plaintiff provides no factual support to back up these allegations. *See Dean v. Westchester Cnty. Dist. Att'ys Office,* 119 F.Supp.2d 424, 430 (S.D.N.Y.2000) (dismissing Title VII claim where plaintiff made only "general, conclusory allegations" that "fail[ed] to create an inference of discrimination"); *Gertskis v. U.S. EEOC,* No. 11–CV–5830 (JMF), 2013 WL 1148924, at *8, 2013 U.S. Dist. LEXIS 39110, at *27 (S.D.N.Y. Mar. 20, 2013) (plaintiffs Title VII claims failed because they were "conclusory and devoid of factual content creating a plausible inference of any discriminatory conduct"), *aff'd,* 594 Fed.Appx. 719 (2d Cir.2014).

Further, it is undisputed that Mr. Appelo both promoted Plaintiff to his position as Vice President of HR for XSSG, and removed him from that position in 2008. (Dkt. 36–1 at ¶¶ 6, 24; Dkt. 47–1 at 6, 24). "[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson,* 232 F.3d 83, 91 (2d Cir.2000); *see also Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) (same).

Finally, contrary to Plaintiff's argument, the decision in *Clanton v. Schlegel Sys.*, No. 05–CV–6456T, 2007 WL 1140444, 2007 U.S. Dist. LEXIS 28338 (W.D.N.Y. Apr. 17, 2007), does not help his claim. In that case, the Court did recognize that the plaintiff had satisfied her burden of establishing a *prima facie* case, but in addition to claiming that her supervisors discriminated against other minorities, the plaintiff submitted evidence from co-employees corroborating that claim. *Id.* at *3, 2007 U.S. Dist. LEXIS 28338, at *9. Plaintiff has presented no such evidence in this case.

Indeed, as the Court recognized in *Clanton*: "Although the Second Circuit Court of Appeals has stated that 'the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*,' it has also noted that '[a] jury cannot infer discrimination from thin air.'" *Id.* at *3, 2007 U.S. Dist. LEXIS 28338, at *8–9 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995)) (alteration in original); *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir.1998).

## B. *Legitimate, Non–Discriminatory Reasons for Demotion*

Even if Plaintiff could meet his burden of establishing a *prima facie* case, Defendant has presented ample evidence that Plaintiff was removed from his position for legitimate, non-discriminatory reasons. Defendant has offered abundant evidence that Plaintiff received poor peer reviews and refused to improve his performance with the assistance of the executive coach, Mr. Story, and that these issues formed the basis for his removal. *See* Dkt. 38 at ¶¶ 11, 32 (Mr. Appelo explaining that removing Plaintiff from his position became "unavoidable" because of Plaintiffs conduct, and his choice to not change it and adopt a more effective communication and management style, and "[f]aced with a number of complaints against Plaintiff ...

extremely low EES scores, and a manager who continued to refuse to accept any accountability for his behaviors or to avail himself of coaching resources made available to him," Xerox had "no other alternative" but to remove Plaintiff); Dkt. 39 at ¶¶ 8–13, 19–23 (Ms. Nazemetz explaining that the decision to remove Plaintiff from his role as Vice President of HR was made for legitimate business reasons, and "became unavoidable given the numerous complaints that 1 and others within Xerox received about Plaintiff's performance," including the results of the 2007 EES, and Plaintiff's failure to take responsibility for his negative results, and his refusal to work with Mr. Story).

Further, the evidence shows that numerous employees filed complaints against Plaintiff relating to his management style and behavior. *See id.* at ¶ 14 (complaint by Loretha McCullough, an African–American HR manager and direct report to Plaintiff, that Plaintiff was intimidating); *id.* at ¶ 14 n.2 (N.Y.SDHR charge filed by Plaintiff's direct report, Shirley Black, that Plaintiff discriminated against her based on her gender); *id.* at 16 (anonymous internal ethics complaint, charging Plaintiff with discrimination in relation to promotions); *id.* at ¶ 25 (anonymous letter from Xerox employee alleging that Plaintiffs behavior made the person feel "humiliated and intimidated"). Ms. McCullough also testified that she found Plaintiff "intimidating," and that when she attempted to "push back" against him, he did not change. (Dkt. 40–11 at 4:16–5:13).

As evidence of Plaintiff's poor performance as Vice President of HR for XSSG, Defendant submits the affidavits of Timothy Conlon, Vice President of HR at Xerox, Mr. Appelo, and Ms. Nazemetz. (Dkt.37–39). Each of the affidavits detail: (1) Plaintiff's low scores as compared to his peers on the 2007 EES, on which Plaintiff

received a score of 42 percent, the lowest score of all Xerox managers; (2) Plaintiff's poor management style which was "condescending, controlling and threatening"; (3) Plaintiff's failure to take complaints against him seriously or improve his management style; (4) the various discrimination complaints lodged against Plaintiff; and (5) Plaintiff's failure to work with Mr. Story and complete a development plan. Further, Mr. Story himself testified that Plaintiff questioned the legitimacy of the negative feedback Mr. Story received from Plaintiff's managers, peers, and direct reports regarding Plaintiff (Dkt. 40–10 at 30:8–22), and that as a result, his engagement with Plaintiff did not continue (*id.* at 33:10–34:3).

Based on this evidence, Defendant has carried its burden to show that it had a legitimate, non-discriminatory reason for removing Plaintiff from his position as Vice President of HR for XSSG.

### C. *Pretext*

■ The burden then shifts back to Plaintiff to demonstrate pretext. In making this demonstration, the plaintiff cannot rely on conclusory, unsupported allegations of discrimination. *Mattera v. JPMorgan Chase Corp.,* 740 F.Supp.2d 561, 575 (S.D.N.Y.2010). "[I]f the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 221 (2d Cir.2004) (citation omitted).

Plaintiff does not make any specific argument as to evidence establishing pretext, but rather contends, in a conclusory fashion, that there is an issue of fact preventing summary judgment because there is evidence that Defendant and Mr. Appelo prevented the promotion of several African–American employees. (Dkt. 47 at 26).

Plaintiff offers no evidence that anyone outside of his protected class was treated more favorably than himself, or that anyone at Xerox made racially derogatory comments to him. Indeed, Plaintiff fails to offer any evidence rebutting Defendant's claim that Plaintiff was removed from his position for legitimate, non-discriminatory reasons. Plaintiff's failure to offer any evidence substantiating his claims of racial discrimination is fatal to his claims. *See McGill v. Univ. of Rochester,* 600 Fed. Appx. 789, 791 (2d Cir.2015) (affirming district court's dismissal of the plaintiff's discrimination claims because "[the plaintiff] failed to offer sufficient evidence to permit a reasonable trier of fact to conclude that defendants' legitimate, nondiscriminatory reasons for the treatment and ultimate termination of McGill were in fact a mere pretext for discrimination. Aside from [the plaintiff's] conclusory and sometimes contradictory allegations, she failed to present competent evidence that her supervisor or trainers did anything that suggests that their decisions were tainted with discriminatory animus."); *see also Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (requiring more than "conclusory allegations" to rebut the defendant's showing that the legitimate, rational reasons it offered were false).

Here, the record lacks facts to support a claim of pretext. Rather, the evidence before the Court demonstrates that Defendant had legitimate, non-discriminatory reasons for removing Plaintiff from his position. Plaintiff has simply failed to carry his burden to establish that those reasons were a pretext for discrimination. *See Augustus v. Nassau,* 596 Fed.Appx. 41, 42 (2d Cir.2015) ("Given the evidence of [the plaintiff's] repeated failures to complete important aspects of her job and the dearth of evidence supporting the existence of a discriminatory animus, the dis-

trict court did not err in finding that [the plaintiff] did not show by a preponderance of the evidence that [the] defendant's non-discriminatory justification was merely a pretext for racial discrimination."), *cert. denied,* —— U.S. ——, 136 S.Ct. 171, 193 L.Ed.2d 139 (2015); *Smith v. Am. Express Co.,* 853 F.2d 151, 155 (2d Cir.1988) (affirming grant of summary judgment for employer because the plaintiffs affidavit and memorandum "reveal nothing that would convince a factfinder that the reasons given by [the employer] for promoting [another employee] rather than [the plaintiff] were a pretext for discrimination. Rather his allegations are conclusory and unsupported by evidence of any weight; they are insufficient to satisfy the requirements under Rule 56(e)."); *Watson v. Geithner,* No. 09 Civ. 6624 (FIBP), 10 Civ. 3948(HBP), 10 Civ. 7282(HBP), 2013 WL 5420932, at *11, 2013 U.S. Dist. LEXIS 139673, at *32 (S.D.N.Y. Sept. 27, 2013) (granting summary judgment in favor of the defendants and noting that where the defendants did not "merely articulate" but "substantially established" legitimate, non-discriminatory reasons, plaintiff's task of proving pretext was "more difficult," and that the plaintiff's opposition brief was a "re-statement of her complaints," and consisted of "conclusory statements that lack evidentiary support.") (quotation omitted).

## VII. *CONCLUSION*

For the foregoing reasons, Defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment in favor of Defendant and close the case.

SO ORDERED.